NOTICE

Decision filed 02/05/21 The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180552-U

NO. 5-18-0552

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| NATIONAL MATERIAL COMPANY, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 10-CH-64 |
| | ) | |
| THE GSI GROUP, LLC, | ) | Honorable |
| | ) | Michael D. McHaney, |
| Defendant-Appellee and Cross-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in denying the plaintiff's posttrial motion seeking prejudgment interest and an *additur* or, in the alternative, a new trial on damages. The trial court also did not err in denying the defendant's posttrial motion for judgment notwithstanding the verdict or, alternatively, a new trial based on certain evidentiary rulings and instructional errors.

¶ 2    After a jury trial, the trial court entered judgment in favor of the plaintiff, National Material Company, LLC (National Material), and against the defendant, The GSI Group, LLC (GSI), for breach of contract. The jury awarded National Material damages in the amount of $1,731,886.50. National Material appeals from the trial court's order denying National Material's posttrial motion seeking prejudgment interest and for *additur* or,

1

alternatively, a new trial on the issue of damages. GSI cross-appeals from the trial court's order denying its posttrial motion seeking judgment notwithstanding the verdict or, alternatively, a new trial, based on certain evidentiary rulings and instructional errors. We affirm the trial court's denial of the parties' posttrial motions.

¶ 3                                    BACKGROUND

¶ 4     National Material is a steel processor and supplier whose primary customers are original equipment manufacturers in the automotive, agricultural products, construction, and electrical appliance industries. GSI manufactures steel grain storage bins and feed tanks for livestock. GSI began buying steel from National Material in the 1980s because, at that time, National Material was the only steel processor in the United States that could supply the heavy-gauge, galvanized steel that GSI needed to make bigger and stronger grain bins. Between 1979 and 2007, Doug Meyer was the purchasing and materials manager for GSI. Beginning in 2003, Meyer's primary contact at National Material was Clayton Deeter, a salesman and an assistant general manager.

¶ 5     Prior to 2007, Meyer would provide Deeter with GSI's forecasted steel needs. These forecasts were for a period of a year or less, and GSI would attempt to give National Material as accurate a forecast as possible. GSI requested that National Material keep a certain amount of parts in stock so that GSI could purchase the products on demand. GSI's purchase price was based upon the price of the steel paid by National Material in making those parts. There were never any written contracts between National Material and GSI.

¶ 6     It took approximately 6 to 12 weeks for National Material to receive the steel from the mill and then process that steel for GSI. GSI's forecasts for the amount of steel

projected gave National Material the lead time necessary for it to obtain and process the steel GSI required for its production. Meyer testified that GSI attempted to purchase the steel that it had projected for use within a three-month period following the forecast. Deeter confirmed that prior to 2007, GSI would typically purchase the forecasted products within a two- or three-month period. Deeter stated that National Material gave GSI "a little leeway" on this time frame, approximately one month, if GSI's business was slow.

¶ 7    The products that National Material ordered and produced for GSI could not easily be resold to another buyer because of the characteristics of the steel, including widths, gauges, thickness, and the coating weight of the zinc. These distinctive characteristics of the steel were specific to GSI and were not conducive to being run through another manufacturer's machines. Meyer testified that GSI believed it had an obligation to purchase all the steel that National Material bought from the mill which was based upon GSI's forecasts, and that GSI never failed to purchase any of the steel that National Material ordered for GSI. Deeter also testified that prior to 2007, GSI always purchased all of the steel National Material ordered for GSI.

¶ 8    In 2006, after a change in ownership, GSI management decided to switch to a competitive bidding process for long-term steel supply contracts. Meyer and Matt Baker, a GSI commodity manager, prepared GSI's request for proposal (RFP) for calendar year 2007 and distributed it on July 26, 2006, to GSI's steel vendors for bidding. In response, Deeter prepared National Material's bid on the 2006 RFP. National Material's bid tied GSI's base price for the raw steel to the CRU index. The CRU is an organization that tracks steel costs and publishes an index of average steel prices. The bid employed a trailing index

formula where the price of steel being paid by GSI was based on the average CRU index price for the previous quarter, minus a discount. National Material had previously used this pricing scheme with other customers, but not with GSI.

¶ 9    National Material was one of the successful bidders on the 2006 RFP. National Material was awarded GSI's business on specific steel parts and received approximately 25 to 30% of GSI's flat rolled steel requirements for 2007. Meyer believed National Material was the exclusive supplier of the parts awarded to it under the 2006 RFP, and that GSI had an obligation to purchase those parts only from National Material.

¶ 10    For the first few months of 2007, the parties performed under the terms of National Material's bid. On February 21, 2007, Mike Fergus, National Material's general manager, sent Meyer a generic contract that National Material had used with other customers, so that GSI could tailor the contract to meet GSI's needs. This contract included a provision requiring the customer to purchase any inventory accumulated by National Material based on the customer's 60-day forecast.

¶ 11    On March 13, 2007, GSI sent National Material a draft written contract, with a term of April 1, 2007, through December 31, 2007, for an estimated 26,000 tons of galvanized steel. This contract included a provision that National Material would use the estimated annual usage provided in the 2006 RFP to assure timely supply of materials to GSI and that it would maintain a 60- to 90-day supply of GSI materials. It also included a provision that in the event of termination of the contract, National Material agreed to sell, and GSI agreed to purchase, all material in National Material's inventory which had been specifically produced for GSI, as well as any noncancelable orders pending with the steel mill. Meyer

4

testified that this last provision was consistent with the way the parties had done business in the past. The contract utilized the trailing CRU index pricing mechanism employed in National Material's bid. On April 27, 2007, National Material sent the draft written contract back to GSI with revisions.

¶ 12 Ultimately, the parties never signed a written supply contract for 2007. The parties continued to conduct their business consistent with National Material's bid on the 2006 RFP. To make a purchase, GSI would issue a purchase order for products to National Material and then National Material would "release" or deliver the steel to GSI. At the end of the contract, GSI purchased all of the steel in National Material's inventory that it had acquired for GSI.

¶ 13 John Hilt, the director of purchasing for GSI, decided to use the RFP process to solicit bids for a two-year supply contract for 2008 and 2009. Meyer created spreadsheets listing the parts GSI would need for those years. There were 209 parts, organized into 16 lots, each with detailed specifications based on GSI's products and manufacturing equipment. In the 2007 RFP, GSI predicted that it would need 132,000 tons of steel in 2008 and 151,000 tons in 2009. The RFP required the bidders to make pricing and volume commitments and to ensure next day delivery of every part GSI needed for the life of the contract. Proposals from bidders were due on September 7, 2007. GSI anticipated that the business would be awarded on October 1, 2007, so that deliveries could begin on January 1, 2008. The RFP explicitly stated that the RFP was not a contract.

¶ 14 On August 15, 2007, Baker sent Deeter the 2007 RFP. On September 7, 2007, National Material submitted its initial bid to GSI. National Material used a trailing CRU

5

index pricing mechanism, minus a discount, to set the base price GSI would pay for raw steel, while extras, such as coatings and processing, were priced separately. Deeter explained that the months used to calculate the average trailing CRU index price did not exactly match the previous quarter because the period was "offset *** backwards by a month in order to help [National Material] purge inventory through the process." After the initial bidding processes, GSI sought additional bids from potential suppliers. GSI requested that the price of zinc coatings and other extras be locked in for the life of the two-year contract. (Zinc prices are volatile, which makes the price of galvanized, or zinc-coated, steel difficult to control.)

¶ 15    On October 19, 2007, representatives from National Material and GSI met to discuss the details of National Material's soon-to-be-submitted fourth proposal. Deeter testified that during this meeting, National Material advised GSI that it would have to commit to a take-or-pay deal to lock in the price of zinc coatings for the entire two-year contract. This meant that GSI would need to purchase all the estimated galvanized steel awarded to National Material under the bid, no matter what.

¶ 16    On October 22, 2007, National Material submitted its fourth bid to GSI. The fourth bid still relied on a trailing CRU index pricing mechanism to set the base price GSI would pay for raw steel, but it offered lower pricing on some of the extras and a fixed price on zinc coating for the entire two-year contract. The average quarterly CRU index price was again "offset" by a month "to allow for inventory rotation." The zinc pricing was backed by one of National Material's steel suppliers, ArcelorMittal. The bid stated that the pricing was contingent on "volume commitments."

6

¶ 17　GSI accepted National Material's fourth bid for some of the steel lots, making National Material its exclusive supplier of the awarded lots. This amounted to approximately 50% of the steel GSI needed for 2008 and 2009. Worthington Steel Company was also a successful bidder on the 2007 RFP and was awarded the other half of GSI's business. In June 2008, GSI and Worthington Steel Company each entered into a separately written supply contract with GSI for 2008 and 2009.

¶ 18　On November 26, 2007, ArcelorMittal sent National Material a contract to supply the galvanized steel needed for the 2008-2009 supply agreement between National Material and GSI. The ArcelorMittal contract was for calendar years 2008 and 2009, and was a take-or-pay contract, with no option for National Material to cancel because ArcelorMittal was using a futures contract to hedge the price of zinc.

¶ 19　On November 26, 2007, Deeter sent an email to Baker advising GSI that National Material was in the process of locking in the price of zinc for the two-year contract with ArcelorMittal, which required National Material to commit to a take-or-pay contract with a specific volume commitment. In the email, Deeter stated,

> "We need a target volume commitment—National will require a minimum usage of 90% of that target. Volumes above the target will be subject to new coating extras if applicable. For example: If GSI target is 135,000 tons— NMC will cover any volumes between 121,500 and 135,000 tons at the agreed contract pricing structure. If GSI usage is less than 90% of the target (121,500), NMC would need GSI to consume the difference no later than March 31, 2010."

¶ 20　On November 27, 2007, ArcelorMittal emailed National Material a revised letter agreement for the two-year supply of galvanized steel. The agreement held zinc prices firm for 139,000 tons of steel for the life of the contract. National Material's base price for the

steel was based upon "slip quarter" CRU index pricing, meaning the price National Material paid for steel in January 2008 was based upon the average Cold Rolled CRU price for September, October, and November 2007, with a volume rebate. In the email, ArcelorMittal asked National Material to confirm the two-year deal so that ArcelorMittal could begin production of the steel in time to meet GSI's January 2008 delivery deadline. National Material signed and returned the contract to ArcelorMittal six months later, on May 30, 2008.

¶ 21 Deeter testified that he called Baker shortly after receiving the email from ArcelorMittal, and that Baker confirmed that GSI was committed to purchasing the minimum volume required. On November 28, 2007, Deeter sent Baker another email, stating:

> "After our conversation, it sounds like the outline below should be accurate with the forecasted usage. We will make the commitment on this volume with Mittal today. So, as long as we consume between 121,500 and 135,000 tons over the 2 year period, we will be fine. If we are coming up short when we reach the end of '09 we can extend the contract into 2010 in order to get to the minimum volume consumption. If we go over, this will not end the contract but the price will be affected by the current zinc coating cost at that time. *** If we [see] the usage as outpacing the calendar we can try to secure more zinc futures, if it is going the other way we can plan to extend the usage on the contract into 2010."

¶ 22 On November 30, 2007, Deeter sent Baker another email regarding the volume commitment. This email provided:

> "In accordance with our conversation, NMC will commit the following to Mittal Steel for the GSI steel contract for 2008-2009.
>
> GSI commits to a usage [of] 135,000 tons over the two year period with the commitment to consume at least 90% of the forecasted usage.

8

As long as GSI consumes between 121,500 and 135,000 tons over the 2 year period, we will be within our obligation. If we are coming up short when we reach the end of '09 we can extend the contract into 2010 in order to get to the minimum volume consumption. If we go over, this will not end the contract but the price will be affected by the current zinc coating cost at that time. *** If we see the usage is outpacing the calendar we can try to secure more zinc futures within the current price structure (no guarantee, but we'll try), if it is going the other way we can plan to extend the usage on the contract into 2010 by three months or a reasonable timeframe that we both agree on.

Please let me know if you have concerns with this plan. Otherwise, this is what we are confirming with Mittal Steel today."

¶ 23 Baker testified that he discussed Deeter's emails containing the volume commitment with John Hilt but that neither Baker nor Hilt responded to the emails with objections. In November 2007, GSI began giving National Material forecasts for GSI's steel requirements, which included 7000 tons for January 2008.

¶ 24 On December 7, 2007, Hilt emailed a written contract to Fergus for his review. Hilt expressed his desire to have the agreement completed by the following week. The contract included the following relevant provisions:

(1) Section 3 provided that, in the event the agreement was terminated, National Material would complete and deliver the products as required by all "issued and acknowledged" purchase orders, as well as any additional purchase orders to which the parties agreed;

(2) Section 4(a) stated that GSI would provide National Material a rolling four-month forecast which National Material would utilize to maintain its inventory levels to fulfill GSI's requirements in a timely manner;

(3) Section 5 provided that GSI was under no obligation to purchase materials from National Material until a purchase order was issued by GSI and acknowledged by National Material;

9

(4) Section 7.1 stated that the quantities of the products awarded to National Material were only estimates and that a contract for the purchase of materials did not arise until the issuance and acknowledgement of a purchase order;

(5) Section 7.2 provided that the base price for the products for any given quarter was to be adjusted based on changes to the average quarterly CRU index price, with the first adjustment beginning in the second quarter of 2008 based on changes to the average for the time period encompassing December 2007, January 2008, and February 2008; and

(6) Section 7.10 was a most favored nation clause providing that National Material would not sell any specified products to another person for less than the price offered to GSI.

¶ 25 Fergus testified that the draft agreement sent by GSI did not contain provisions requiring GSI to make a minimum volume commitment or to purchase any pipeline inventory ordered or processed by National Material for GSI's needs. Fergus testified that the parties also had not previously discussed including a most favored nation clause.

¶ 26 On January 18, 2008, Fergus returned a revised written contract to Hilt that contained numerous changes, including a volume commitment and an agreement to purchase any pipeline inventory. Those terms were found in section 4 of the proposed contract and provided as follows:

(1) Section 4(d) stated that at the end of the two-year term, GSI agreed to purchase all of National Material's remaining inventory produced for GSI and all noncancelable orders pending with the mill within three months after the end of the contract, for not less than 125,000 tons of steel and up to 139,000 tons of steel; and

(2) Section 4(e) stated that, in the event of termination of the contract, GSI would purchase all material held in National Material's inventory which had been specifically produced for GSI and all noncancelable pending orders.

10

¶ 27 Fergus testified that in consideration of fluctuations in demand, the volume commitment in section 4(d) gave GSI additional time to consume the products. Fergus also testified that 4(e), regarding the pipeline inventory, was consistent with how National Material and GSI had done business in 2007, and was a provision that the parties had agreed upon in October 2007.

¶ 28 At trial, Hilt testified that National Material had made numerous significant changes to the contract prior to returning it to GSI. Hilt stated that GSI did not agree to many of these revisions, including National Material's additions in sections 4(d) and 4(e). Hilt testified that these changes had not been discussed with him prior to his receiving the contract back from National Material. In February and March 2008, Fergus and Hilt exchanged emails attempting to set up dates to discuss the written contract but were not successful in agreeing to a meeting time.

¶ 29 In May 2008, Hilt instructed GSI's outside counsel, Ed O'Toole, to call National Material's attorney, David Susler, to try to advance contract negotiations. On May 22, 2008, O'Toole and Susler discussed the parties' competing contract drafts. O'Toole stated that he advised Susler that GSI would not agree to a contract that included sections 4(d) and 4(e), regarding the volume commitment and the purchasing of pipeline inventory. O'Toole testified that he advised Susler that GSI opposed 17 of National Material's 33 proposed changes to the contract. Susler told O'Toole he would confer with his contacts at National Material and would get back to O'Toole. Susler did not contact O'Toole again regarding the contract negotiations. A written contract was never finalized or signed by the parties.

11

¶ 30    Through September 2008, the parties continued to fully perform under the terms of National Material's fourth bid. During this time, steel prices rose sharply, nearly doubling between November 2007 and August 2008. Due to the trailing CRU index pricing mechanism, GSI's purchases from National Material were significantly lower than the spot market price. In September 2008, however, steel prices began falling dramatically. Falling prices meant that National Material and GSI were now paying more for steel than the price on the spot market because their supply contracts were based on the trailing CRU index price.

¶ 31    As of October 1, 2008, GSI's forecasted usage for the fourth quarter of 2008 was approximately 10,000 tons. At that time, National Material had 7400 tons in inventory and another 2600 tons arriving from ArcelorMittal. The parts in National Material's inventory, however, did not exactly match up with the parts forecasted by GSI, and Deeter believed National Material would need to purchase an additional 3500 to 4000 tons of steel to meet GSI's forecasts for the remainder of 2008 and early 2009. At that time, GSI's forecasted usage for the first quarter of 2009 was 5670 tons in January, 6090 tons in February, and 6635 tons in March. National Material ordered steel for GSI based on these forecasts.

¶ 32    In October 2008, GSI's purchases from National Material fell significantly, approximately 90%. In October and November 2008, National Material and GSI had four meetings to discuss the issues of pricing and product releases. The first meeting occurred on October 14, 2008, which was also attended by representatives from ArcelorMittal. During this meeting, GSI requested a change in the pricing scheme because it was not able to offer competitive prices on its products. Fergus testified that he advised Hilt during this

meeting that any pricing changes would have to be agreed upon by all parties and would be contingent upon the pipeline inventory being taken under the "old pricing agreement." Hilt testified he advised Fergus that GSI was not going to take any more pipeline inventory if National Material would not lower prices on the inventory and future purchases. Hilt testified that they then "went through kind of a blackout period" for a couple of weeks where National Material would not return GSI's phone calls or communicate with them. Hilt stated that GSI "got nervous" and purchased steel on the spot market "to keep our business moving."

¶ 33    Sometime after the first meeting, ArcelorMittal agreed to change the trailing quarterly pricing scheme of National Material's contract to a month-to-month pricing scheme. At a meeting on October 27, 2008, Fergus advised Hilt that ArcelorMittal was willing to adjust the pricing scheme of its contract with National Material. Fergus told Hilt that National Material was willing to pass the savings on to GSI, provided GSI purchased the pipeline inventory that National Material had on hand under the "old pricing agreement." At the third meeting, National Material requested a schedule from GSI to release the pipeline inventory and insisted that National Material needed a commitment on the pipeline inventory prior to any more discussions about revising future prices. At the final meeting, Jim Barry, president and chief operating officer of National Material, insisted on resolving the issue of the pipeline inventory, asserting it needed to be purchased under the two-year supply contract. Scott Clawson, president and chief executive officer of GSI, responded that the parties did not have a two-year contract.

13

¶ 34    On November 18, 2008, Fergus sent Hilt an email setting forth a proposed release schedule for the pipeline inventory through April 2009. The following day, Hilt emailed his reply, refusing to accept National Material's schedule, and stating that GSI would only release material through purchase orders based on its needs. On November 21, 2008, National Material's attorney, Susler, notified GSI that it was in breach of the parties' two-year supply contract. Susler's letter reiterated National Material's offer to release the pipeline inventory through April 2009 and offered GSI reduced prices on the products. On November 26, 2008, GSI's counsel sent a letter to Susler denying the existence of any contract between the parties.

¶ 35    On January 15, 2009, the parties entered into a letter agreement regarding the approximately 8700 tons of remaining pipeline inventory. The January 2009 letter agreement provided that any pipeline inventory consumed during the first quarter of 2009 would be purchased at pre-set prices, as established by an attached spreadsheet. The price of any pipeline inventory shipped during the second quarter of 2009 was to be dictated by the trailing CRU index pricing formula. The letter agreement provided that, "[c]onsistent with the 2008 ordering process, GSI will not commit to any monthly tonnage requirement, until purchase orders are issued and accepted by [National Material]. However, GSI will endeavor to consume on hand inventory." GSI also agreed not to purchase any parts in the pipeline inventory from any supplier other than National Material until the entire pipeline inventory was consumed.

¶ 36    On April 3, 2009, Deeter sent Baker a proposal further reducing the second quarter prices of the remaining 4000 tons of pipeline inventory. Deeter's proposal acknowledged

that while second quarter pricing was then currently in force, the next price adjustment under the contract would occur on July 1, 2009.

¶ 37    Prior to execution of the January 2009 letter agreement, GSI purchased materials that were available in National Material's pipeline inventory from other suppliers. Baker testified that after the January 2009 letter agreement, GSI went to National Material first if it needed items from the pipeline inventory. When National Material was unable to fill the order, due to lack of product or quality issues, GSI went to other suppliers. The evidence indicated that GSI had purchased 417 tons of National Material's pipeline inventory in December 2008 and 2945 tons in 2009. National Material sold the remainder of its pipeline inventory either to other customers or for scrap.

¶ 38    On December 23, 2009, National Material filed suit against GSI for breach of the 2008-2009 supply agreement, breach of the January 2009 letter agreement, fraud, unjust enrichment, specific performance, and an accounting. After the counts for fraud, an accounting, and specific performance were dismissed, GSI filed a motion for summary judgment on the claims for breach of the 2008-2009 supply agreement and unjust enrichment. On September 23, 2014, the trial court granted GSI's motion for summary judgment finding there was no meeting of the minds on a contract, that there was no writing sufficient to satisfy the statute of frauds, and that GSI was not unjustly enriched. On October 2, 2014, the trial court made a Rule 304(a) finding (see Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) and stayed the proceedings on the remaining counts of National Material's complaint. On appeal, this court reversed the summary judgment in favor of GSI and

15

remanded the case for trial. *National Material Co. v. GSI Group, L.L.C.*, 2016 IL App (5th) 140542-U.

¶ 39    National Material tried three claims to the jury: breach of the 2008-2009 supply agreement (first claim), unjust enrichment (second claim), and breach of the January 2009 letter agreement (third claim). National Material's second and third claims were brought in the alternative, and the jury was instructed that if it found in favor of National Material on the first claim, it need not consider the remaining claims. Under the first claim, the jury was instructed that National Material could recover resale damages and lost profits as damages for GSI's alleged breach of the 2008-2009 supply agreement.

¶ 40    At trial, Arthur Cobb, a certified public accountant, testified on behalf of National Material as its expert regarding damages. With regard to resale damages, Cobb testified that there were 8338 tons of material in the pipeline inventory, after accounting for the 417 tons purchased by GSI in December 2008.[1] Cobb testified that the "contract price" of the pipeline inventory was $1329 per ton, which he derived from National Material's company

---

[1]At trial, during the experts' testimony as to damages, both parties relied heavily on the use of demonstrative exhibits, including numerous charts. On appeal, this court was placed at a significant disadvantage in understanding the experts' testimony because these exhibits were not included in the record. The record indicates that some of these charts were similar to, but not exactly the same as, documents found elsewhere in the record on appeal. The most pressing example was a chart that was included in Cobb's report. Cobb's testimony was particularly difficult to follow, as he frequently misspoke, transposed figures, and estimated figures. Cobb's testimony was also incomplete in that he did not always provide information or figures as to each component of his calculations. The figures Cobb testified to at trial were sometimes inexplicably different than those in his report. While the difference may have only been slight, at times by only a penny, the differences were magnified when applied to tens of thousands of tons of product. At times, this court was forced to reverse engineer some of Cobb's calculations in an attempt to get accurate figures because the figures Cobb testified to at trial were mathematically incorrect. In this order, this court has done its best to present a clear, accurate, and mathematically sound summary of the experts' testimony. Slight variations in the figures and calculations presented have had not any effect on this court's ultimate judgment.

documents and the January 2009 letter agreement. Cobb testified the "contract price" was based on the sales price for fourth quarter 2008 because that was when National Material expected GSI to purchase those products under the terms of the 2008-2009 supply agreement. Based on these figures, National Material's expected revenue from the pipeline inventory was $11,081,202. Cobb testified that National Material sold the pipeline inventory for only $4,784,883, resulting in $6,296,319 in resale damages.

¶ 41    To calculate National Material's lost profits for GSI's failure to purchase committed volumes over the course of the entire contract, Cobb assumed that GSI committed to purchasing at least 90% of 135,000 tons of steel, or 121,500 tons, under the 2008-2009 supply agreement. Cobb testified that GSI purchased 47,174 tons from National Material and was obligated to purchase an additional 74,326 tons of steel over the life of the contract. Cobb then converted those tons into hundredweights by multiplying by 20 because costs were calculated in hundredweights. Cobb then divided the 1,486,520 hundredweights of steel, or 74,326 tons, by 14 months, assuming the remaining tons of steel would have been purchased between November 2008 and December 2009, which is an average of 106,180 hundredweights or 5309 tons per month.[2]

| Date | Sales price to GSI used | Average trailing quarterly CRU index | Material costs used by Cobb | Processing costs | Estimated hundredweight of tons to be sold per month | Cobb's Estimated Lost Profits for the month |
|---|---|---|---|---|---|---|

[2]To better understand the experts' testimony, this court has prepared a table of some of the figures utilized by the experts in estimating National Material's lost profits. Due to irregularities in some of the testimony, these figures are best described as approximate, intended only to assist the reader in obtaining a broader understanding of the experts' testimony. Slight variations or inaccuracies in the figures have not influenced this court's ultimate determination on appeal.

| | by Cobb | price of steel | | | | |
|---|---|---|---|---|---|---|
| November 2008 | $66.49 | $58 | $53 | $8 | 106,180 | $582,928 |
| December 2008 | $66.49 | $58 | $53 | $8 | 106,180 | $582,928 |
| January 2009 | $56.91 | $48.42 | $48.42 | $8 | 106,180 | $52,028 |
| February 2009 | $56.91 | $48.42 | $48.42 | $8 | 106,180 | $52,028 |
| March 2009 | $56.91 | $48.42 | $48.42 | $8 | 106,180 | $52,028 |
| April 2009 | $39.41 | $30.92 | $30.92 | $8 | 106,180 | $52,028 |
| May 2009 | $39.41 | $30.92 | $30.92 | $8 | 106,180 | $52,028 |
| June 2009 | $39.41 | $30.92 | $30.92 | $8 | 106,180 | $52,028 |
| July 2009 | $34.33 | $25.83 | $25.83 | $8 | 106,180 | $53,090 |
| August 2009 | $34.33 | $25.83 | $25.83 | $8 | 106,180 | $53,090 |
| September 2009 | $34.33 | $25.83 | $25.83 | $8 | 106,180 | $53,090 |
| October 2009 | $35.15 | $26.66 | $26.66 | $8 | 106,180 | $52,028 |
| November 2009 | $35.15 | $26.66 | $26.66 | $8 | 106,180 | $52,028 |
| December 2009 | $35.15 | $26.66 | $26.66 | $8 | 106,180 | $52,028 |

¶ 42    Cobb testified that the starting contract sales price for the steel, beginning in November and December 2008, was $66.49 per hundredweight. Cobb testified the initial sales prices was derived from the January 2009 letter agreement and the average sales price for products in "the last months of 2008." Cobb acknowledged during cross-examination that he did not provide a calculation as to the average sales price in his report, and that the average sale prices for the months of September, October, and November 2008 were less

than his starting sales price of $66.49. Notably, $66.49 per hundredweight is equivalent to the $1329 per ton that Cobb utilized to calculate resale damages.

¶ 43 Cobb testified that the sales prices for the remaining months of the contract were then adjusted based on fluctuations to the average CRU index price of steel for the previous quarter. For example, the average CRU index price of steel for the months of June, July, and August 2008 was $58 per hundredweight. The average CRU index price of steel for the months of September, October, and November 2008 dropped by $9.58 to $48.42 per hundredweight. Thus, the sales price for January, February, and March 2009, or the first quarter of 2009, also decreased by $9.58 per hundredweight from the sales prices in place for November and December 2008.

¶ 44 Cobb testified that the material costs for November and December 2008 were $53 per hundredweight and were based on the company's inventory cost analysis, a document in which National Material recorded and measured the costs of its inventory. The cost of materials was adjusted beginning in January 2009 to reflect the average trailing quarterly CRU index price of steel. Cobb testified that the processing costs remained the same throughout the analysis and were based on documents maintained by National Material and on discussions he had with Fergus.

¶ 45 On direct examination, Cobb testified that the lost profits for National Material for the 14-month period from November 2008 through December 2009 was $1,793,000. Cobb explained that the lost profits estimated for November and December 2008 were significantly higher than the remaining months due to "the mechanics of the model" and "because of the price changes that occurred and how the 2008 agreement brings pricing

19

over matched against the costs. So it's just—it's a function of the market prices and a function of the nature of the model." Cobb stated there was a $600,000 overlap in his estimates for resale damages and lost profits damages. Cobb testified that the proper award of damages was $6.2 million in resale damages plus $1.1 million in lost profits, for a total of $7.3 million in damages for GSI's breach of the 2008-2009 supply agreement.

¶ 46 On cross-examination, Cobb testified that his resale damages calculations were based on National Material's expectation of when the pipeline inventory should have been released to GSI and the price at which that inventory should have been sold. Cobb acknowledged that if GSI had "no need and no obligation" to purchase the inventory until a later date, then the sales price would have been lower. Specifically, Cobb testified that under the terms of the 2008-2009 supply agreement, the sales prices for the first and second quarters of 2009 were lower than the sales prices in the fourth quarter of 2008. Cobb also acknowledged that his lost profit analysis assumed GSI would purchase an average monthly tonnage even though GSI had no obligation to buy any minimum monthly tonnage. Cobb maintained this assumption despite the collapse of the worldwide demand for steel in the fourth quarter of 2008. Cobb testified that his damages calculations did not take into consideration the most favored nation clause or whether GSI attempted to purchase additional pipeline inventory which National Material was unable to supply.

¶ 47 Cobb also testified on cross-examination that the material costs and the average trailing CRU index prices were the same for every month in 2009, and that these figures were consistent with National Material's contract with ArcelorMittal for the cost of steel. Cobb acknowledged that the material costs he utilized in calculating lost profits for

November and December 2008 were inconsistent with the average CRU trailing index price and National Material's contract with ArcelorMittal. Cobb testified the $53 in material costs were derived from discussions with Fergus and inventory cost reports, and was "the value of the inventory that was already held" by National Material and was consistent with the CRU index prices of steel in September and October 2008. Cobb stated that if he had used the average trailing CRU index price for November and December 2008, the damages estimate would be reduced by approximately one million dollars.

¶ 48    Judith Spry, a forensic accountant and certified public accountant, testified for GSI as its expert on damages. With regard to lost profits, Spry testified that she believed Cobb erred in using $53 per hundredweight as the material costs for November and December 2008, because it was inconsistent with the average trailing quarterly CRU index price of steel and with National Material's contract with ArcelorMittal. Spry believed the material costs for those months should have been $58 per hundredweight, consistent with the CRU index pricing scheme. Spry testified that once the material costs for November and December 2008 were adjusted to conform to the contract price between National Material and ArcelorMittal, National Material's total costs, for the materials and processing, became $66 per hundredweight and its estimated lost profits for those months dropped to $52,028 for each month. Spry testified this figure was more consistent with the other monthly estimated amounts and reduced the total lost profits damages by $1,061,800, to a total of $731,578. During cross-examination, Spry testified she did not analyze National Material's actual costs to acquire the inventory it had in stock for GSI in November and December

21

2008, and she could not offer an opinion as to whether National Material's actual material costs for inventory it had on hand was $58 per hundredweight.

¶ 49    Spry agreed with Cobb that there was a direct relationship between the sales price paid by GSI and the average trailing quarterly CRU index price under the 2008-2009 supply agreement, in that the two figures should move in tandem. Spry, however, challenged the initial sales price of $66.49 utilized by Cobb. Spry testified the average monthly sales price per hundredweight for products purchased by GSI was $56.83 in September 2008, $64.54 in October 2008, and $64.82 in November 2008. The average weighted price per hundredweight during this period was $58.22. Spry testified that utilizing any of these figures, whether any individual price per month, or the average price, or the weighted average price, would have resulted in zero lost profits to National Material because the company would have lost money under the contract, assuming that the initial material and processing costs were $66 per hundredweight. Spry testified that National Material's lost profits damages could have been further reduced under the most favored nation clause in the first draft contract, in light of evidence in the record suggesting that National Material was selling products at reduced rates to other customers.

¶ 50    As to resale damages for the pipeline inventory, Spry testified she did not estimate National Material's damages from the sale of the pipeline inventory using fourth quarter 2008 prices under the two-year supply agreement. Spry stated she did not see a provision in any of the draft contracts requiring GSI to purchase the pipeline inventory during any specific time period. Instead, Spry calculated resale damages based on the terms in the January 2009 letter agreement because the purpose of that agreement was to wind down

22

the pipeline inventory. Spry testified that the letter agreement contained a price decrease from fourth quarter 2008 prices for items purchased in the first quarter of 2009. The letter agreement further provided that the CRU index formula would apply to any purchases of pipeline inventory in the second quarter of 2009. Spry testified that because steel prices continued to drop, National Material would not have had any damages related to the pipeline inventory for items purchased by GSI during the second quarter of 2009. Spry stated that using the highest possible prices under the January 2009 letter agreement, National Material's maximum potential resale damages were $496,720. Spry opined that any damages to National Material would have been further reduced by National Material's sale of pipeline inventory to other customers, rendering that inventory unavailable when ordered by GSI.

¶ 51    After 11 days of trial, the jury returned a general verdict in National Material's favor on its first claim, for breach of the 2008-2009 supply agreement. The jury awarded National Material $1,731,886.50 in damages.

¶ 52    On October 19, 2018, National Material filed a posttrial motion seeking to amend the judgment to add prejudgment interest, and for an *additur* or, in the alternative, for a new trial on damages only. The same day, GSI filed a posttrial motion seeking judgment notwithstanding the verdict on all three of National Material's claims and, alternatively, a conditional motion for a new trial based on certain evidentiary rulings and instructional errors. On October 24, 2018, the trial court denied the parties' respective posttrial motions.

¶ 53    On appeal, National Material argues the trial court erred in denying National Material's posttrial motion seeking prejudgment interest and an *additur*. Alternatively,

23

National Material requests a new trial on damages, asserting the jury's award was manifestly inadequate and bore no reasonable relationship to the loss suffered by National Material, and that the trial court erred in the exclusion of certain evidence on damages. GSI cross-appeals, asserting that the trial court erred in denying its posttrial motion for judgment notwithstanding the verdict on all three of National Material's claims and, alternatively, denying GSI's conditional motion for new a trial based on numerous alleged erroneous evidentiary rulings and instructional errors.

¶ 54                                    ANALYSIS

¶ 55                                 I. Jury Note

¶ 56    Some of National Material's claims on appeal rely upon this court's consideration of a two-page "jury note" purporting to explain the jury's calculation of damages. This court must address whether the note can be considered in assessing National Material's claims on appeal.

¶ 57    As already noted, the jury returned a general verdict in favor of National Material for breach of the 2008-2009 supply agreement and awarded National Material $1,731,886.50 in damages. After the verdict was announced, GSI polled the jury, and each juror affirmed that the verdict stated on the form was his or her verdict. The court then dismissed the jury. After the jury was discharged, the court stated as follows:

> "THE COURT: They handed me the instructions and the court's exhibits which were the notes and the verdict form. This is a new one—a first for me. They didn't write on anything else but he did—there's a note here on the back—well, there's just a note here."

24

¶ 58    The "note" was not on the verdict form and included several calculations and a brief description suggesting which figures were used in making those calculations. The court noted that the final figure reached on the note was $0.25 different than the amount awarded by the jury on the verdict. The court indicated that the note was within the "packet of instructions from [the] jury" and that the court did not "know what it means."

¶ 59    On appeal, National Material asserts that the contents of the note demonstrate that the jury failed to follow the court's instructions on calculating damages and believes it supports the imposition of an *additur*.[3] It is well settled in Illinois "that a jury may not impeach its verdict by affidavit or testimony which shows the motive, method, or process by which the verdict was reached." *Chalmers v. City of Chicago*, 88 Ill. 2d 532, 537 (1982); *Redmond v. Socha*, 216 Ill. 2d 622, 636 (2005). A jury's verdict may not be challenged following the jury's discharge by explaining the basis for the jury's findings or asserting that the jury was mistaken. *Chalmers*, 88 Ill. 2d at 537; see also Ill. R. Evid. 606(b) (eff. Jan. 1, 2011) (precluding evidence from jurors on matters occurring during deliberations or influencing deliberations except in limited circumstances). The testimony or affidavit of a juror cannot be used to show that the jury misunderstood the instructions or the law, or the effect of a particular finding on their verdict. *Chalmers*, 88 Ill. 2d at 539. The meaning and effect of a verdict must be judged from the terms of the verdict alone. *Chalmers*, 88 Ill. 2d at 539.

---

[3]In its brief, National Material implies that the trial court purposely waited until after the jury was discharged to alert the parties of the note's existence. National Material's suggestion that the trial court was aware of the note's existence prior to the discharge of the jury is unsupported by the record. Nothing in the record supports a finding that the note was discovered prior to the jury's discharge, and thus, no such presumption will be made.

25

¶ 60    In this case, National Material is not attempting to impeach the jury's verdict with juror affidavits or testimony. Instead, it is attempting to do so with two pages of calculations and an "explanation" found among the instructions and exhibits returned to the court with the jury's verdict. The note is unsigned, and it is unclear what purpose the noted served. Under these circumstances, the note is considerably less credible or reliable than a juror's affidavit or testimony. Even presented in a superior form, National Material's reliance on the contents of the note is nothing more than an improper attempt to impeach the jury's verdict. We find that the contents of the note could not properly be considered by the trial court in ruling on the parties' posttrial motions, and that this court will not consider the note in assessing the issues on appeal.

¶ 61    II. *Additur* and New Trial on Damages Based on the Adequacy of the Award

¶ 62    The jury found in favor of National Material on its claim for breach of contract of the 2008-2009 supply agreement. The 2008-2009 supply agreement was a contract for the sale of goods governed by article 2 of the Uniform Commercial Code (UCC). See 810 ILCS 5/2-102 (West 2008). National Material sought to recover both resale damages and lost profits pursuant to section 2-703 of the UCC. 810 ILCS 5/2-703(d), (e) (West 2008). These damages are cumulative in nature. 810 ILCS Ann. 5/2-703, Uniform Commercial Code Comment 1, at 519 (Smith-Hurd 2009); *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 682 (7th Cir. 1987).

¶ 63    With respect to resale damages, National Material sold the 8338 tons of steel in its inventory that was originally intended for GSI under the 2008-2009 supply agreement to other customers and to GSI at a reduced rate. Under section 2-706(1), National Material's

resale damages were "the difference between the resale price and the contract price together with any incidental damages *** less expenses saved in consequence of the buyer's breach." 810 ILCS 5/2-706(1) (West 2008). National Material also sought to recover damages for its lost profits from GSI's breach, which are defined as "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages ***, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." 810 ILCS 5/2-708(2) (West 2008).

¶ 64   The court instructed the jury that National Material was seeking two categories of contract damages, (1) damages related to National Material's resale of its inventory of steel parts for GSI after the breach or repudiation and (2) damages related to National Material's lost profits for steel parts under the contract that National Material did not have in inventory. The jury was instructed that these damages were cumulative in nature and that National Material could recover under both categories if it met its burden of proof. The jury instructions regarding the calculation of resale damages and lost profits were consistent with the statutes set forth above. The court further instructed the jury that National Material had the burden of proving each element of damages claimed as a direct and natural result of GSI's breach, and that it should determine the sum of money that would put National Material in as good a position as it would have been if GSI had fully performed under the contract.

¶ 65   On appeal, National Material argues the trial court abused its discretion in denying it an *additur* and increasing the jury's award to $7,027,897, or, in the alternative, in failing

to order a new trial on the issue of damages because the jury's award of $1,731,886.50 was manifestly inadequate and bore no reasonable relationship to the loss suffered by National Material.

¶ 66                                          A. *Additur*

¶ 67    *Additur* and a new trial on damages are related forms of relief. *Merrill v. Hill*, 335 Ill. App. 3d 1001, 1006 (2002). Under the doctrine of *additur*, a trial court may order a new trial based on the inadequacy of the damages unless the defendant consents to an increase in the award of damages. *Merrill*, 335 Ill. App. 3d at 1006. *Additur* is appropriate to correct the jury's omission of a liquidated or easily calculated item of damage. *Merrill*, 335 Ill. App. 3d at 1006; *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 84. *Additur* is not available in cases where the jury must make credibility determinations based on conflicting testimony. *Sheth*, 2013 IL App (1st) 110156, ¶ 84. "Because *additur* is essentially a conditional ruling on a motion for a new trial, the trial court should consider whether, beyond the criteria for *additur*, grounds for a new trial otherwise exist." *Merrill*, 335 Ill. App. 3d at 1006.

¶ 68    In this case, National Material has not demonstrated that it satisfied the criteria for an *additur*. National Material's contention that an *additur* of $7,027,897 is appropriate is completely dependent upon consideration of the note returned with the jury's verdict. As already discussed, the note cannot be used to challenge the jury's verdict, and consideration of the note in assessing the adequacy of the jury's award is improper. Without resorting to the contents of the note, *additur* is not appropriate in this case. The parties presented competing expert witnesses at trial, which required the jury to weigh the evidence and to

28

make credibility determinations. Furthermore, during trial, the experts presented a myriad of figures related to damages, and it cannot be said that the damages in this case were easily calculable. Because the damages were not easily calculable and the jury's award was dependent upon credibility determinations, *additur* is not appropriate. Therefore, the trial court did not err in denying National Material's posttrial motion requesting an *additur*.

¶ 69                    B. New Trial on Damages Based on Adequacy of the Award

¶ 70    National Material has also failed to demonstrate that it is entitled to a new trial on damages based on the jury's award being manifestly inadequate or bearing no reasonable relationship to the loss suffered. The amount of damages to be assessed is peculiarly a question of fact for the jury to determine and its determination is accorded great weight. *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 356 (2010). This court will not interfere with the jury's assessment of damages and grant a request for a new trial on damages unless the amount is manifestly inadequate, if it is clear that a proven element of damages has been ignored, or if the amount awarded bears no reasonable relationship to the loss suffered. *Merrill*, 335 Ill. App. 3d at 1006; *Union Planters Bank*, 402 Ill. App. 3d at 356. " 'If a jury's award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand.' " *Union Planters Bank*, 402 Ill. App. 3d at 356 (quoting *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1138 (2000)).

¶ 71    A reviewing court will reverse a jury verdict only if it is against the manifest weight of the evidence. *Union Planters Bank*, 402 Ill. App. 3d at 355. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where

29

the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." (Internal quotation marks omitted.) *Union Planters Bank*, 402 Ill. App. 3d at 355. On review, this court may not simply reweigh the evidence and substitute its judgment for that of the jury. *Union Planters Bank*, 402 Ill. App. 3d at 355. Furthermore, the determination of a motion for new trial rests within the sound discretion of the trial court, and its ruling will not be reversed absent an abuse of that discretion. *Union Planters Bank*, 402 Ill. App. 3d at 355-56. In assessing whether the trial court abused its discretion, the reviewing court considers whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. *Union Planters Bank*, 402 Ill. App. 3d at 356. National Material asserts the jury's award of $1,731,886.50 was manifestly inadequate and bore no reasonable relationship to the loss suffered by National Material because it was entitled to recover both lost profits and resale damages, and the "undisputed" evidence at trial was that National Material suffered damages of at least $6,296,319 in resale damages.

¶ 72                          A. Resale Damages

¶ 73    Consistent with section 2-706(1) of the UCC, the jury was instructed that resale damages were calculated as "the difference between the resale price and the contract price" minus any expenses that National Material saved as result of GSI's breach of the contract. The primary source of conflict between the parties on the question of resale damages is the determination of the "contract price." In this case, the parties disagreed not only over the calculation of that price but also, and perhaps more importantly, when GSI had to purchase the pipeline inventory.

30

¶ 74                 1. When Did GSI Have to Purchase the Pipeline Inventory?

¶ 75    National Material's position at trial, and on appeal, was that the "contract price" for the pipeline inventory was governed by the trailing CRU index prices for the fourth quarter of 2008. Cobb testified that he used fourth quarter 2008 prices to calculate the resale damages of the pipeline inventory because that was when National Material anticipated the inventory would have been sold, based on GSI's forecasted usage for that period.

¶ 76    In support of this position, National Material presented evidence of the parties' course of dealings. Course of dealing evidence is evidence of "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." 810 ILCS 5/1-303(b) (West 2008). National Material elicited testimony that prior to 2007, GSI typically accepted the products in National Material's inventory based on GSI's forecasts within two to three months of it being processed. The evidence was that National Material would give GSI "some leeway" on this time frame if GSI's production was slow.

¶ 77    The evidence at trial was that as of October 1, 2008, GSI's forecasted usage was approximately 10,000 tons for the fourth quarter of 2008 and an additional 18,395 tons for the first quarter of 2009. At that time, National Material had 7400 tons in inventory, with another 2600 tons of steel scheduled for arrival. Based on GSI's forecast of additional inventory, National Material ordered additional steel to meet GSI's anticipated needs. Around this same time, GSI's purchases from National Material fell significantly, by approximately 90%. Based on the parties' course of dealings, National Material believes it

is entitled to resale damages for the 8338 tons of pipeline inventory at fourth quarter 2008 prices because the pipeline inventory was produced in reliance on GSI's forecasted usage for that time period.

¶ 78   While National Material's assumption is based upon the parties' course of dealings, there is no question that the draft contracts exchanged between the parties did not include a provision requiring GSI to purchase the forecasted materials or those materials already in the pipeline within a specified period of time. National Material attempted to add significant provisions to the written contract, including 4(d) requiring GSI to purchase a minimum volume over the life of the contract; and 4(e) requiring GSI to purchase any pipeline inventory held by National Material upon termination of the contract. National Material did not, however, attempt to add any provision requiring GSI to purchase the pipeline inventory within any defined time period. Instead, the draft contracts were clear that GSI was under no obligation to purchase products from National Material until GSI issued a purchase order for the products, and only after National Material accepted the purchase order, suggesting that both parties had to be in agreement on this arrangement. While National Material's emails to GSI stressed a minimum volume commitment over the course of the entire two-year contract, the undisputed evidence at trial was that the parties agreed that the 2008-2009 supply agreement did not contain a minimum monthly volume commitment. Furthermore, the jury could have concluded that National Material's execution of the January 2009 letter agreement and numerous emails to GSI representatives, wherein the CRU index pricing scheme was employed for GSI purchases of the pipeline inventory in the second and third quarters of 2009, suggested that the parties

32

did not agree that GSI was *required* to purchase the pipeline inventory in the fourth quarter of 2008.

¶ 79 On appeal, National Material does not point to any writing between the parties evidencing that the parties agreed that GSI would be required to purchase materials on the forecasted schedule under the 2008-2009 supply contract. Although National Material presented course of dealing evidence that could have supported a jury finding that the contract contained such a term, GSI presented evidence supporting a finding that GSI did not assent to such a term.

¶ 80 It is well settled that the jury determines what terms comprised the contract and the intent of the parties. *W.H. Lyman Construction Co. v. Village of Gurnee*, 131 Ill. App. 3d 87, 93 (1985). "In cases involving the sale of goods, course of dealing, usage of trade, and course of performance may be considered to explain or supplement the terms of an agreement even without a determination that the agreement is ambiguous." *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1144 (2005); 810 ILCS 5/1-303(d), 2-202 (West 2008). The weight and significance to be given course of dealings evidence is for the jury's determination. *Technology Solutions Co. v. Northrop Grumman Corp.*, 356 Ill. App. 3d 380, 385 (2005).

¶ 81 The jury was not instructed that it had to conclude that GSI was required to purchase forecasted materials on any timeline to find in favor of National Material. Instead, the jury was instructed that it could only find for National Material if the jury found "the parties had a two-year contract for the sale of goods in which GSI agreed to purchase all of its steel requirements for certain specific lots of products, or portions of lots, exclusively from

National Material under a pricing formula that trailed a published market index of steel prices, and with a minimum volume commitment for the steel requirements GSI had to purchase."[4] The jury was also instructed that National Material had to prove that both parties assented to the same conditions, and that there was a meeting of the minds on the essential terms and conditions. The jury was further instructed that if it found that the contract was formed by conduct, it could consider (1) the course of dealing between the parties, (2) the course of performance between the parties, and (3) the usage of trade within the industry, in determining the provisions of the parties' agreement.

¶ 82　In this case, the jury was presented with conflicting evidence as to whether the parties agreed that GSI was required to purchase the pipeline inventory in the fourth quarter of 2008 based on its forecasted usage. The jury clearly did not believe that GSI assented to this term, otherwise the jury would have awarded damages more closely aligned to the amount sought by National Material. The jury was the ultimate arbiter as to the terms of the contract, and this court will not reverse a jury's determination that is clearly supported by the record.

¶ 83　　　　　　　　2. Contract Price of the Pipeline Inventory

¶ 84　Assuming the jury did not find that the contract required GSI to purchase the pipeline inventory in the fourth quarter of 2008, there is still the question of determining "the contract price" for the pipeline inventory in order to calculate National Material's resale damages.

---

[4]Jury instruction number 12.

34

¶ 85    There is no dispute that the parties agreed to employ a trailing CRU index pricing scheme for GSI's steel purchases. The great weight of the evidence at trial indicated that the price paid by GSI was dependent upon when GSI made its purchase, as opposed to the price being dependent upon the costs paid by National Material. For example, in its second, third, and fourth bids, National Material indicated that the prices quoted reflected the published CRU index prices for the third quarter of 2007, and that "[t]he index period for this quote is based on material *delivered* to GSI in November, December, and January." National Material indicated that the prices would be the same for the first quarter of 2008, and that this same formula would be used to establish prices throughout the contract period. In its fourth bid, National Material explained that the base price for items sourced from ArcelorMittal was calculated as follows: the "Cold Rolled CRU base [price] less $10/Ton equals the established base price for the following quarter (plus a one month 'offset' to allow for inventory rotation)," plus an extra cost for coatings for all galvanized items.

¶ 86    The assumption that the sales price paid by GSI was dictated by GSI's purchase date, as opposed to National Material's costs, underlies the damages analysis of both parties' experts. In calculating National Material's lost profits for November and December 2008, Cobb did not make any adjustment to the sales price charged to GSI to account for differences between the trailing CRU index price of steel and National Material's alleged actual cost of steel. This assumption resulted in Cobb estimating that National Material's lost profits during each of those months were more than 10 times any other month considered. Conversely, this same assumption (that the sales price to GSI was dictated by GSI's purchase date as opposed to National Material's costs) led Spry to conclude that

35

National Material's resale damages on the pipeline inventory were between $0 and $496,720.

¶ 87   In its dealings with GSI, as evidenced by the January 2009 letter agreement and subsequent correspondence, National Material acknowledged that the CRU index formula would dictate the price of pipeline inventory purchased by GSI, absent any other agreement. These dealings specifically recognized that some of these purchases could be made as late as the third quarter of 2009. Cobb calculated that the price of steel per ton applicable to GSI's purchases from National Material would have been $1329 in the fourth quarter of 2008; $1,138.20 in the first quarter of 2009; $788.20 in the second quarter of 2009; and $686.60 in the third quarter of 2009.

¶ 88   Cobb testified that the 8338 tons of pipeline inventory would have resulted in $11,081,202 in revenue in the fourth quarter of 2008, resulting in $6,296,310 of resale damages. Applying Cobb's opinion as to the price of steel for the first three quarters of 2009 reveals that 8338 tons of steel would have grossed only $9,490,311.60 of revenue in the first quarter of 2009; $6,572,011.60 of revenue in the second quarter of 2009; and $5,724,870.80 of revenue in the third quarter of 2009. Once the resale revenue of $4,784,883 is subtracted from these figures, the potential resale damages of the pipeline inventory under the terms of the 2008-2009 supply agreement were as follows: (1) $4,705,428.60 if all of the pipeline inventory was purchased in the first quarter of 2009; (2) $1,787,128.60 if all of the pipeline inventory was purchased in the second quarter of 2009; and (3) $939,987.80 if all of the pipeline inventory was purchased in the third quarter of 2009. As already noted, Spry opined that National Material's resale damages were

36

between zero and $496,720. She arrived at this conclusion by taking into consideration pricing under the January 2009 letter agreement and the CRU index pricing formula and reducing the damages based on National Material's inability to fill orders for pipeline inventory placed by GSI due to quality issues or lack of inventory.

¶ 89   National Material's assertion that the evidence was "undisputed" that National Material suffered $6,572,011.60 in resale damages on the pipeline inventory is not supported by the record. Instead, the record demonstrates that GSI credibly challenged National Material's various calculations regarding damages incurred as to the pipeline inventory, both during the cross-examination of Cobb and through the testimony of their own expert, Spry. Practically speaking, the evidence at trial supported a finding of resale damages of almost any figure between $0 and $6,572,011.60.

¶ 90                                    B. Lost Profits

¶ 91   At trial, Cobb opined that National Material's lost profits were $1,793,000. Spry opined that National Material suffered no lost profits from GSI's breach because National Material would have lost money under the terms of the 2008-2009 supply agreement. As already set forth in this order, the experts' opinions primarily diverge on the proper method for calculation of National Material's material costs and the sales price paid by GSI. As with resale damages, the jury was charged with weighing the credibility of each expert's opinion and rendering a verdict supported by the evidence. In this case, the evidence at trial supported a finding that National Material's lost profits ranged from $0 to $1,793,000.

¶ 92   In short, the parties presented competing evidence suggesting that National Material's damages, from both resale damages and lost profits, ranged anywhere from $0

37

to $7,489,319, depending on the reasoning and methodology employed. Each party's expert testified at length, collectively covering the better part of two days of trial. Each expert thoroughly explained their respective opinions as to his or her calculation of damages, including the methodologies, assumptions, and sources underlying their figures. Almost every figure, whether it related to cost, sales price, or volume, was exhaustively scrutinized and explained. Ultimately, it was the jury's duty to weigh the credibility of the expert testimony and render a verdict, which it did. The fact that the jury's award did not precisely match either expert's opinion does not suggest that the jury erred. Instead, it suggests that the jury's award was based upon its consideration of all the testimony and evidence submitted. The jury's award of $1,731,886.50 was within the flexible range of conclusions reasonably supported by the evidence, and this court will not substitute its judgment for that of the jury. Based on the foregoing, we find that National Material has failed to demonstrate that the jury's damages award was manifestly inadequate or bore no reasonable relationship to the damages suffered. The trial court did not err in denying National Material's posttrial motion seeking an *additur*, or a new trial on damages, based on the adequacy of the jury's verdict.

¶ 93  III. New Trial on Damages Based on Evidentiary Rulings

¶ 94  Next, National Material argues that it is entitled to a new trial on damages because the trial court erroneously barred the supplemental expert report prepared by Cobb and limited Fergus's testimony on damages. Discovery in civil actions is governed by an orderly and comprehensive set of procedures. *Custer v. Cerro Flow Products, Inc.*, 2019 IL App (5th) 190285, ¶ 25. The rules of discovery establish guidelines for a fair and orderly

38

procedure whereby discovery and full disclosure may be accomplished. *Harris v. Harris*, 196 Ill. App. 3d 815, 819 (1990).

¶ 95 The Illinois Supreme Court "rules are neither aspirational nor mere suggestions; they are rules of procedure which have the force of law, creating a presumption they will be obeyed and enforced as written." *Simpkins v. HSHS Medical Group, Inc.*, 2017 IL App (5th) 160478, ¶ 34. Our supreme court has held that its rules are ineffective unless trial courts do not countenance violations and unhesitatingly enforce discovery provisions. *Buehler v. Whalen*, 70 Ill. 2d 51 (1977).

¶ 96 Illinois Supreme Court Rule 219(c) authorizes the trial court to impose just sanctions, including barring a witness from testifying about an issue, upon any party who unreasonably fails to comply with the discovery rules or any court order entered pursuant to those rules. Ill. S. Ct. R. 219(c) (eff. July 1, 2002); *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). "A just order of sanctions under Rule 219(c) is one which, to the degree possible, insures both discovery and a trial on the merits." *Shimanovsky*, 181 Ill. 2d at 123. The purpose of imposing a sanction is to coerce compliance with discovery rules, not to punish the noncompliant party. *Shimanovsky*, 181 Ill. 2d at 123. The determination of whether to impose sanctions pursuant to Rule 219(c) and, if so, the type of sanction is within the broad discretion of the trial court. *Shimanovsky*, 181 Ill. 2d at 120. Absent an abuse of that discretion, this court will affirm the trial court's determination. *Shimanovsky*, 181 Ill. 2d at 120. Furthermore, a party is not entitled to a reversal for a new trial based on the trial court's evidentiary rulings unless the trial court's error caused substantial prejudice and affected the outcome of the case. *Ramirez v. FCL*

*Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 215. The party seeking reversal bears the burden of demonstrating prejudice. *Ramirez*, 2014 IL App (1st) 123663, ¶ 198.

¶ 97                              A. Cobb's Supplemental Report

¶ 98    On September 11, 2013, the trial court entered an agreed order providing that "[f]act discovery on all issues, except damages, shall be completed by October 4, 2013," and that National Material "shall supplement its damages-related disclosures and discovery responses, and make its expert witness disclosures, pursuant to Illinois Supreme Court Rule 213(f)(2) and (3) on or before October 4, 2013." The trial court entered an agreed order extending the deadline for National Material's damages-related disclosures, discovery responses, and expert witness disclosures until October 16, 2013. That day, National Material produced Cobb's initial damages report. Cobb's initial report contained 28 pages of substantive analysis and included the following conclusions as to National Material's damages: (1) $1,793,000 in lost profits; (2) $6,296,000 in resale damages; (3) $41,457 in outstanding amounts due from GSI for partial payments on products; (4) $169,999 in lost profits for the processing of GSI products and scrap by a National Material affiliate; and (5) $10,432,000 for GSI's unjust enrichment related to the 2008-2009 supply agreement and pipeline inventory.

¶ 99    On January 17, 2014, GSI's counsel deposed Cobb. Immediately prior to commencement of the deposition, National Material provided GSI with an amended copy of Cobb's report. The amended report contained handwritten notations reflecting Cobb's revisions. Cobb's revised conclusions as to damages included (1) reducing resale damages from $6,296,000 to $4,587,000 and (2) and reducing unjust enrichment from $10,432,000

40

to $8,712,609, based on $7,349,609 for purchases made in 2008 and $1,363,000 for purchases of the pipeline inventory. Cobb's handwritten revisions also included numerous additional figures, calculations, and supporting citations. GSI accepted Cobb's revised report.

¶ 100  On January 28, 2014, GSI filed its motion for partial summary judgment on two counts of National Material's complaint. On March 21, 2014, the trial court ordered GSI to make its own expert disclosures, pursuant to Illinois Supreme Court Rule 213(f)(2) and (3) (eff. Jan. 1, 2007), on or before April 14, 2014, and for National Material to depose GSI's experts by May 16, 2014. On April 14, 2014, GSI produced Spry's damages report.

¶ 101  On May 12, 2014, the circuit court entered an agreed order establishing deadlines for the parties' briefing on GSI's motion for summary judgment and scheduled a hearing on the motion. The court also scheduled the final pretrial conference for August 21, 2014, and set trial for November 10, 2014. The court then extended the deadline for National Material to depose GSI's expert and, on July 15, 2014, National Material's counsel deposed Spry.

¶ 102  On September 23, 2014, the trial court granted GSI's motion for partial summary judgment. On October 2, 2014, the court entered a Rule 304(a) finding and stayed further proceedings in the matter. The court ordered that "[i]f either side seeks to continue discovery or other motions during the stay they shall first seek court approval." National Material appealed and, on October 5, 2016, this court reversed the circuit court's partial summary judgment order and remanded the cause for further proceedings. *National Material Co. v. GSI Group, L.L.C.*, 2016 IL App (5th) 140542-U. GSI filed a petition for

leave to appeal to the Illinois Supreme Court, which was denied. On March 6, 2017, this court's mandate issued. *National Material Co.*, 2016 IL App (5th) 140542-U.

¶ 103   On May 25, 2017, National Material moved for leave to amend its complaint. On June 9, 2017, National Material produced additional documents to GSI, after Fergus located the documents in a drawer in his office. National Material advised GSI that National Material believed many of these documents had previously been produced to GSI, but did not identify which documents were new and which had previously been produced. GSI asserted that after comparing these documents to prior productions, it learned that many of the documents had not previously been disclosed even though they should have been. On August 31, 2017, GSI re-deposed Fergus, limited to issues related to the late-disclosed documents.

¶ 104   Meanwhile, on June 26, 2017, the circuit court held a case management conference. At that time, the court denied National Material's motion for leave to amend and scheduled a status hearing for September 7, 2017, the pretrial conference for January 12, 2018, and the jury trial for February 26, 2018. On September 7, 2017, the trial court entered a case management order setting various pretrial deadlines, with no extensions for additional discovery. The case management order set the pretrial conference for January 25, 2018, and the trial for February 26, 2018.

¶ 105   On November 2, 2017, National Material served its second supplemental answers to GSI's interrogatories, including those related to damages, and produced additional documents to GSI. Some of these documents were older documents that should have been disclosed earlier, and some of the documents had recently been created. One of these

documents was a new spreadsheet created by Fergus. This new spreadsheet revised a previously disclosed spreadsheet that had been created by National Material in 2007 and reflected National Material's internal costs, which National Material had used in bidding on the 2007 RFP. The original spreadsheet reflected National Material's costs, including processing costs of $8 per hundredweight, for purposes of bidding on all of GSI's anticipated business under the 2007 RFP. The new spreadsheet reflected National Material's costs, including processing costs of $7.32 per hundredweight, for only those parts that National Material was awarded under the 2007 RFP.

¶ 106  On November 13, 2017, GSI's counsel conducted a Rule 201(k) conference (see Ill. S. Ct. R. 201(k) (eff. July 1, 2014)) with National Material's counsel in response to the November 2, 2017, disclosures. On November 14, 2017, GSI attempted to confirm via email that National Material was not going to change "the damages theories, calculations, or bases for [its] expert's damages conclusions as set forth in [its] expert's report and deposition testimony." GSI responded, "The second supplemental interrogatory answers speak for themselves." On November 17, 2017, National Material produced another new document, a summary intended to replace a document produced earlier that month.

¶ 107  On November 21, 2017, National Material served GSI with its second supplemental disclosures and a newly revised expert report by Cobb. Cobb's supplemental report contained 51 pages of substantive material, or an additional 23 pages from his previous reports. The new report's conclusions as to National Material's damages contained numerous revisions. The supplemental report increased unjust enrichment damages from $8,712,609 to $12,218,000, based on an increase in GSI's unjust enrichment for purchases

43

in 2008 from $7,349,000 to $10,265,000, and for purchases of the pipeline inventory from $1,353,000 to $1,953,000. Cobb created a newly-consolidated category of damages, estimating a total of $9,162,000 in lost profits based on GSI's failure to purchase committed volumes under the 2008-2009 supply agreement, including the pipeline inventory, and for National Material's affiliate for processing GSI steel products and scrap. This new category included an increase from $1,790,000 to $2,659,836 for GSI's failure to purchase committed volumes, based on revisions to National Material's processing costs. The adjustment to National Material's processing costs also increased the loss from National Material's affiliate from $169,999 to $208,979.51. Cobb also included a slight adjustment to his resale damages estimate, reducing it from $4,587,000 to $4,585,000. Eleven pages of the new material consisted of Cobb's responses to Spry's damages report. The supplemental report also relied upon numerous additional documents not previously identified in discovery, including documents that had only recently been created and produced to GSI on November 2, 2017.

¶ 108  On December 6, 2017, GSI filed a motion to strike the supplemental disclosures and to bar National Material from presenting Cobb's revised opinions and conclusions at trial. On December 13, 2017, the court entered an agreed scheduling order establishing a briefing schedule on GSI's motion, setting the matter for a hearing, and striking the February trial date. The court's order rescheduled the trial for September 4, 2018.

¶ 109  On December 22, 2017, National Material filed its opposition to GSI's motion. In its opposition, National Material asserted that after a recent review of its documents by

Fergus, it learned that National Material's processing costs were $7.32 per hundredweight,[5] instead of the $8 per hundredweight utilized in Cobb's prior reports. National Material maintained that the following changes were made to Cobb's report: (1) adjustments to reflect "new cost information" obtained by Cobb; (2) changes to the estimated volumes of steel used in Cobb's lost profit analysis to account for sales of the pipeline inventory to GSI under the January 2009 letter agreement; (3) small changes to resale damages based on a "rounding issue" in the volume; (4) a new category of damages under the January 2009 letter agreement in response to criticism raised by Spry; (5) changes to the damages related to lost processing and scrap business based on the new cost information; (6) adjustments to the unjust enrichment figures to reflect actual quantities of product shipped to GSI in November and December 2008, as opposed to the estimated figures Cobb previously used; and (7) rebuttal to Spry's criticisms of Cobb's report.

¶ 110 National Material asserted that the supplemental report was a seasonable supplement under Rule 213(i) and was necessary to correct any errors and to allow Cobb to respond to the criticisms raised by Spry. National Material argued it had not previously had the opportunity to respond to Spry's criticism due to the initial scheduling orders and the intervening appeal. National Material also argued that, assuming there was a discovery violation, barring Cobb's supplement report and related testimony was too harsh of a sanction for the violation. National Material argued that GSI was neither surprised nor prejudiced by Cobb's supplemental report, and that National Material's supplementation

---

[5]While National Material's pleadings in the trial court indicated that National Material's revised processing costs were $7.32 per hundredweight, Cobb's calculations in the supplemental report utilized $7.25 per hundredweight.

45

was made in good faith. To alleviate any potential prejudice to GSI, National Material suggested that Spry could supplement her damages report as necessary and the parties could re-depose the experts. National Material also suggested that GSI could depose Fergus for a third time, on the limited issue of Fergus's recalculation of National Material's processing costs.

¶ 111 On January 16, 2018, GSI filed its reply in support of its motion to bar Cobb's supplemental report and related testimony. GSI argued that it was surprised and prejudiced by Cobb's supplemental report because it contained numerous substantive changes to Cobb's opinions and methodologies years after discovery was closed, and relied upon recently disclosed documents, including existing documents that should have been previously disclosed and newly created documents. With regard to the nature of the testimony in question, GSI argued that it was not seeking to bar all of Cobb's testimony as to damages, only to limit his testimony to those opinions expressed in his first amended report and excluding those in the untimely supplemental report. GSI asserted that it had been diligent in seeking discovery, in that it had deposed Cobb and disclosed its own expert within the deadlines set by the case management order. GSI also argued that it timely objected to the disclosure of Cobb's supplemental report. Finally, GSI argued National Material's actions, including its repeated late discovery disclosures and productions over the preceding months, demonstrated a lack of good faith.

¶ 112 On January 24, 2018, the trial court held a hearing on GSI's motion. At the hearing, National Material maintained that Cobb's supplemental report was a seasonable disclosure under Rule 213(i) and there was no unfair surprise to GSI, because the disclosure was made

more than 60 days before trial. National Material argued that the pendency of the appeal and accompanying stay of the trial court proceedings affected the timing of its discovery, that there was no bad faith on the part of National Material because the errors were discovered after a change in representation for National Material, and that the adjustments to processing costs in the supplemental report were based on documents that National Material had timely produced to GSI several years earlier.

¶ 113 At the hearing, GSI argued that Cobb's supplemental report should be barred because it violated the court's Rule 218 case management orders (see Ill. S. Ct. R. 218 (eff. July 1, 2014)) regarding discovery and was not a seasonable supplement, in that it was submitted four years after the close of discovery. GSI observed that some of the amendments in Cobb's supplemental report were based on newly created and disclosed documents in violation of the case management order, while other amendments were based on National Material's realization that it had misinterpreted the information within the documents National Material had produced four years earlier. GSI argued that those amendments based on the old discovery material were not seasonable, in that it was not based new information that was previously unavailable, while those amendments based on the recently disclosed documents relied upon documents produced in violation of the Rule 218 case management order.

¶ 114 On January 31, 2018, the trial court granted GSI's motion, striking National Material's second supplemental disclosures and barring National Material from presenting Cobb's newly disclosed expert opinions and conclusions. In granting the motion, the court observed that "[d]iscovery is like gas. It will expand to consume whatever space it is

47

allowed; which is why there are Supreme Court rules governing it. These rules are not aspirational. The mere fact that this case is not set for jury trial until September is not a sufficient basis for violating [and/or ignoring] these rules." The court ruled that National Material could present rebuttal testimony from Cobb as to any criticisms of his report testified to by Spry.

¶ 115  On June 29, 2018, GSI filed a motion *in limine* to bar National Material's use of documents disclosed after the close of discovery in October 2013. On August 16, 2018, the trial court granted GSI's motion. National Material has not appealed the trial court's ruling on this motion.

¶ 116  On appeal, National Material argues that the trial court erred in barring Cobb's supplemental expert report and related testimony because National Material complied with the rules requiring supplemental disclosures at least 60 days before trial. National Material also argues the court erred in inflicting too harsh of a remedy without considering alternative remedies. National Material maintains that the court's error was prejudicial because Cobb's supplemental report increased National Material's estimates lost profit damages by almost a million dollars, and Cobb was prevented from responding to Spry's criticisms of his report.

¶ 117       1. Was National Material's Supplemental Disclosure "Seasonable"?

¶ 118  Illinois Supreme Court Rule 218(a) requires the trial court to hold a case management conference shortly after the filing of a case to consider, among other issues, the "deadlines for the disclosure of witnesses and the completion of written discovery and depositions." Ill. S. Ct. R. 218(a)(5)(iii) (eff. July 1, 2014). Illinois Supreme Court Rule

218 allows the trial court wide latitude to manage cases on its docket, after considering a variety of factors set forth in the rule. See Ill. S. Ct. R. 218 (eff. July 1, 2014). Rule 218 provides that the case management order:

> "controls the subsequent course of the action unless modified. All dates set for the disclosure of witnesses, including rebuttal witnesses, and the completion of discovery shall be chosen to ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates that trial will commence, unless otherwise agreed by the parties. This rule is to be liberally construed to do substantial justice between and among the parties." Ill. S. Ct. R. 218(c) (eff. July 1, 2014).

¶ 119 According to the committee comments, "[a] separate road map will chart the course of each case from a point within six months from the date on which the complaint is filed until it is tried." Ill. S. Ct. R. 218, Committee Comments (rev. June 1, 1995). The goal of the rule is to "prevent the potential for discovery abuse and delay which might otherwise result." Ill. S. Ct. R. 218, Committee Comments (rev. June 1, 1995).

¶ 120 Illinois Supreme Court Rule 213(f)(3) requires a party to disclose a retained expert witness's opinions and the bases for those opinions. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). Rule 213(i) requires each party to "seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2018). The committee comments to Rule 213(i) state that "seasonably supplement" varies with the facts of each case but does not allow a party to fail to comply with the spirit of the rule by either negligent or willful noncompliance. Ill. S. Ct. R. 213(i), Committee Comments (rev. June 1, 1995); *Smith v. Murphy*, 2013 IL App (1st) 121839, ¶ 21.

49

¶ 121 Here, the trial court entered case management orders directing that "[f]act discovery on all issues, except damages, shall be completed by October 4, 2013," and that National Material "shall supplement its damages-related disclosures and discovery responses, and make its expert witness disclosures, pursuant to Illinois Supreme Court Rule 213(f)(2) and (3)" by October 16, 2013. National Material initially complied with the court's order and timely produced Cobb's damages report. Subsequent case management orders set deadlines for Cobb's deposition, the production of Spry's report, and Spry's deposition. These actions were all taken in compliance with the trial court's case management orders. Notably, on January 17, 2014, three months after Cobb's report was due, National Material produced an amended report to GSI, which GSI accepted. There were no other case management orders regarding supplemental damages-related disclosures and discovery or the experts' damages opinions.

¶ 122 It was not until November 2, 2017, four years after the deadline, that National Material supplemented some its interrogatory answers and produced additional discovery on damages. On November 21, 2017, National Material served GSI with its second supplemental disclosures and produced a significantly amended expert report. The supplemental expert report allegedly corrected figures used in Cobb's initial calculations, based on documents not previously identified in discovery and recently produced documents, and responded to Spry's criticisms of Cobb's report.

¶ 123 First, National Material contends that its supplemental disclosures, including Cobb's supplemental expert report, were made in compliance with discovery rules because they constituted "seasonable supplements," pursuant to Rule 213(i), in that they were made

more than 60 days before trial. National Material's position is that any supplemental disclosure made at least 60 days before trial is seasonable under the rules.

¶ 124  Rules 213(f)(3), 213(i), and 218(c) are intended to be read together to ensure that discovery is completed no later than 60 days prior to the trial. *Gee v. Treece*, 365 Ill. App. 3d 1029, 1036 (2006). "Thus, information disclosed pursuant to Rule 213(i) must normally be disclosed no later than 60 days before the trial." *Gee*, 365 Ill. App. 3d at 1036. While Rule 218 establishes a deadline for the disclosure of witnesses and the completion of discovery, the trial court may, in its discretion, set its own cutoff dates. See *Ford v. Herman*, 316 Ill. App. 3d 726, 732 (2000) (when no discovery cutoff date is specified by the trial court, discovery must be completed no later than 60 days "before the date on which the trial court reasonably anticipates the trial will commence" (internal quotation marks omitted)); and *Knight v. Haydary*, 223 Ill. App. 3d 564 (1992) (although former Rule 220 sets a deadline for the discovery of an expert, the court may set its own cutoff dates for the disclosure and discovery of expert witnesses).

¶ 125  We reject National Material's argument that any supplemental disclosure made more than 60 days before trial is *per se* seasonable under the rules. While the rules anticipate that supplemental disclosures will normally occur more than 60 days before the trial, the trial court may, in its discretion, set its own cutoff dates. See *Ford*, 316 Ill. App. 3d at 732. Furthermore, Rule 213(i) requires each party to seasonably supplement their discovery responses whenever new or additional information becomes known to a party. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2018). While what constitutes a "seasonable supplement" varies with the facts of each case, a party may not fail to comply with the spirit of the rule

51

by either negligent or willful noncompliance. Ill. S. Ct. R. 213(i), Committee Comments (rev. June 1, 1995); *Smith*, 2013 IL App (1st) 121839, ¶ 21. The determination of whether a party's supplementation is "seasonable" requires consideration not only of the amount of time the disclosure was made prior to trial but also, and more importantly, the circumstances precipitating the supplemental disclosure. This includes an inquiry into when the "new or additional information" was discovered, the circumstances of its discovery, and the amount of time between its discovery and its disclosure.

¶ 126 National Material's position that any supplemental disclosure made more than 60 days before trial is seasonable is contrary to the language and spirit of the rules. National Material's position would allow a party to wrongfully withhold vital supplemental discovery from the opposing party for any length of time, so long as he eventually disclosed it 60 days before trial. Such a reading is clearly not contemplated by the rules, is contrary to the spirit and purpose of the rules, and could unnecessarily cause surprise and delay in the final weeks of trial preparation.

¶ 127 Next, National Material asserts that Cobb's supplemental report constitutes a seasonable supplement because Cobb's revisions were based upon "new information." The primary difference, for purposes of appeal, between Cobb's original report and his second supplemental report was the figure he used for National Material's processing costs in calculating damages. National Material contends that the cost originally used by Cobb, $8 per hundredweight, "was based on Cobb's analysis of National Material's bid for all of GSI's steel purchases for 2008 and 2009." National Material, however, was only awarded half of GSI's business under the 2008-2009 supply agreement. Thus, Cobb should have

only considered the processing costs of those parts actually awarded under the contract. When this was done, National Material's processing costs allegedly dropped to $7.32 per hundredweight.

¶ 128 On appeal, National Material provides contradictory information on the discovery of this "new or additional information" regarding its reduced processing costs. At one point in its brief, National Material asserts that it "uncovered some documents regarding National Material's costs and immediately disclosed them to GSI." In making this representation, National Material does not identify these "uncovered" documents or what they entailed. The record, however, indicates that the error came from a misreading by Fergus and/or Cobb of an internal cost workup created as part of National Material's bid on the 2007 RFP. National Material's bid on the 2007 RFP was a document prepared by National Material, using its own operating costs, and was the bedrock of National Material's successful contract claim. While National Material's employee and expert may have erroneously misapplied the information within this document, the document itself, and its contents, cannot be classified as "new or additional information."

¶ 129 Furthermore, Cobb's supplemental report included changes to his damages calculations for three separate categories of damages based upon revisions made to the volume of products National Material sold to GSI. While National Material has represented that Fergus discovered the error in the calculation of processing costs during National Material's trial preparation, it has offered no explanation for Cobb's revisions to volume. National Material's pleadings indicated that changes to volume were made because Cobb's original report utilized incorrect estimated volumes instead of actual quantities of products

53

sold, and that there were "rounding issues." This case involves a contract for, and sales completed in, 2008 and 2009. National Material has offered no reasonable explanation of why Cobb was relying on estimates for the volume of products sold when writing his first report in 2013 but was able to use precise figures when revising his report in 2017.

¶ 130 Cobb's figures regarding costs and volume for each of his three reports were, or could have been, derived from National Material's own documents. While Fergus's and Cobb's mistakes are unfortunate, we cannot say that these revelations, and the supplemental disclosures they necessitated, constitute a "seasonable supplement" as contemplated by Rule 213(i). National Material has presented no compelling reason why these errors were not discovered until more than four years after Cobb's initial damages report. Again, whether a supplement is "seasonable" varies with the facts of each case; however, it does not allow a party to fail to comply with the spirit of the rule by negligent or willful noncompliance. Ill. S. Ct. R. 213(i), Committee Comments (rev. June 1, 1995); *Smith*, 2013 IL App (1st) 121839, ¶ 21. Here, the "new or additional" information discovered by National Material was that its employees and experts misinterpreted National Material's own documents as to its costs and the volume of units sold. The four-years late discovery of these errors falls into the category of negligence.

¶ 131 A similar finding is required with regard to Cobb's November 2017 responses to Spry's criticisms of his report. The express language of Rule 213(i) imposes an obligation on a party to supplement discovery whenever new or additional information becomes known to that party. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2018); *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 938 (2000). The obligation to disclose expert testimony under

54

Rule 213 extends to testimony responding to the theories of opposing experts. *Copeland*, 316 Ill. App. 3d at 938.

¶ 132  GSI produced Spry's report in April 2014, and National Material deposed her in July 2014. National Material did not offer any rebuttal to Spry's report until it submitted Cobb's supplemental report in late November 2017. National Material argues it did not have an opportunity to offer its response to Spry's report because the case was stayed between October 2, 2014, and March 6, 2017, pending appeal of the trial court's grant of summary judgment in favor of GSI. There was, however, a 5½-month period between the production of Spry's report in April 2014 and the stay ordered in October 2014. There was an additional 8½-month period between the issuance of this court's mandate in March 2017 and National Material's supplemental disclosure in November 2017. Excluding the period when the action was stayed on appeal, the plaintiff still waited approximately 14 months to issue a response to Spry's criticisms. This delay, in what was then an eight-year-old case, was not reasonable and was not a seasonable supplement under Rule 213(i). Based on the foregoing, we find that National Material's November 21, 2017, supplemental disclosures, including Cobb's supplemental expert report, was not a seasonable supplemental disclosure under Rule 213(i) and violated the trial court's discovery orders.

¶ 133      2. Was Barring Cobb's Supplemental Report an Appropriate Sanction?

¶ 134  Next, National Material argues the trial court's order barring Cobb's supplemental report and related testimony as a sanction for its discovery violation was impermissibly harsh. As already noted, the trial court may impose just sanctions, including barring a witness from testifying about an issue, against a party who unreasonably fails to comply

55

with the discovery rules or any court order entered pursuant to those rules. Ill. S. Ct. R. 219(c) (eff. July 1, 2002); *Shimanovsky*, 181 Ill. 2d at 120. Unreasonable noncompliance with a discovery rule is defined as a deliberate and pronounced disregard for the rule. *Shelbyville Mutual Insurance Co. v. Sunbeam Leisure Products Co.*, 262 Ill. App. 3d 636, 641 (1994). Unreasonable noncompliance is determined, in part, by the importance of the information that has not been produced. *Shelbyville Mutual Insurance Co.*, 262 Ill. App. 3d at 641.

¶ 135 A "just" order of sanctions is one which, to the degree possible, allows both discovery and a trial on the merits. *Shimanovsky*, 181 Ill. 2d at 123. The purpose of imposing a sanction is to coerce compliance with discovery rules, not to punish the noncompliant party. *Shimanovsky*, 181 Ill. 2d at 123. There are several factors that a trial court is to consider in determining what sanction, if any, to impose: (1) the surprise to the adverse party, (2) the prejudicial effect of the proffered testimony or evidence, (3) the nature of the testimony, (4) the diligence of the adverse party in seeking discovery, (5) the timeliness of the adverse party's objection to the evidence, and (6) the good faith of the party offering the testimony. *Shimanovsky*, 181 Ill. 2d at 124. No single factor is determinative, and the court is to consider these factors in light of the unique factual situation that the case presents. *Shimanovsky*, 181 Ill. 2d at 127.

¶ 136 The determination of whether to impose sanctions pursuant to Rule 219(c) and, if so, the type of sanction is within the broad discretion of the trial court. *Shimanovsky*, 181 Ill. 2d at 120. Absent an abuse of that discretion, this court will affirm the trial court's determination. *Shimanovsky*, 181 Ill. 2d at 120. Furthermore, a party is not entitled to a

reversal for a new trial based on the trial court's evidentiary rulings unless the trial court's error caused substantial prejudice and affected the outcome of the case. *Ramirez*, 2014 IL App (1st) 123663, ¶ 215. The party seeking reversal bears the burden of demonstrating prejudice. *Ramirez*, 2014 IL App (1st) 123663, ¶ 198.

¶ 137 While National Material acknowledged the six factors to be utilized in assessing a trial court's discovery sanction in the lower court, it does not analyze each of them on appeal. Instead, National Material argues the trial court's sanction was impermissibly harsh because the supplemental disclosure was not made on the eve of trial and the court did not consider any less harsh remedies, including allowing both parties to amend their damages reports and re-depose Fergus and the expert witnesses. National Material also argues the nature of Cobb's testimony was critical because it increased National Material's estimated lost profits by approximately one million dollars, which had a significant impact on National Material's claim for damages under the 2008-2009 supply agreement. To the extent possible, this court acknowledges National Material's arguments on appeal and has made every effort to discuss its claims in the context of the applicable *Shimanovsky* factors.

¶ 138 The first factor, the surprise to the adverse party, weighs slightly in favor of GSI. GSI was first informed of substantial changes to National Material's expert witness's report on damages years after discovery had concluded and after the cause was set for trial. Contrary to National Material's assertions on appeal, the revisions in Cobb's supplemental report were not relatively minor. Cobb's supplemental report was almost twice as long as his initial reports and included a spectrum of changes over numerous categories of damages. Many of these changes were based on National Material's errors in interpreting

57

its own documents and on recently created and disclosed documents. Furthermore, when GSI suspected that National Material may be making changes to its damages estimates based on National Material's late production of documents, National Material refused to confirm whether it would be making any changes despite knowing that such changes were likely imminent.

¶ 139  With regard to the second and third factors, the prejudicial effect of the proffered testimony or evidence and the nature of the testimony, admission of Cobb's substantially revised supplemental report on damages would have been prejudicial to GSI, absent curative measures, because it would have required reopening expert discovery years after its closure. National Material acknowledged that allowing Cobb's supplement report would have required allowing GSI to supplement it expert's report and an additional round of depositions of the experts and Fergus.

¶ 140 On the fourth and fifth factors, the diligence of the adverse party in seeking discovery and the timeliness of the adverse party's objection to the evidence, the record indicates that GSI was diligent in its discovery obligations, and its objection to Cobb's supplemental report was immediate and without delay.

¶ 141  The sixth factor, the good faith of the party offering the testimony, is mixed. While the record does not necessarily reveal any bad faith on National Material's part, it is not clear that the disclosure was entirely done in good faith. Contrary to National Material's representation, Cobb's supplemental report is not based upon "new" information. Instead, Cobb's revisions are based on the unearthing of additional discoverable documents, an untimely response to Spry's criticisms, and the realization that National Material's

58

company employee and expert seriously misinterpreted the company's own documents. Again, National Material has offered no reasonable explanation for the adjustments Cobb made to the volume of products sold, other than to indicate that Cobb used incorrect figures and estimates in his original report. Furthermore, in the trial court, National Material indicated that the supplemental report was also rewritten to "make it easier to understand" and to provide increased support and authority for the opinions contained therein. Cumulatively, these revisions suggest that greater care should have been taken in the initial preparation of the report. This failure to exercise appropriate diligence and care is unfortunate, to say the least. These omissions, however, resulted in mistakes as opposed to a bad faith effort to mislead.

¶ 142 Nevertheless, with respect to National Material's discovery disclosures, the record suggests, at a minimum, a lack of diligence and, less favorably, tactical gamesmanship. The record demonstrates a history of repeated late disclosures by National Material, in June 2017 and in November 2017. These late productions required GSI to repeatedly wade through National Material's productions to determine which documents were previously disclosed, which documents should have previously been disclosed, and which documents were newly created. National Material's late disclosures in June 2017 forced GSI to re-depose Fergus, five years after his original deposition.

¶ 143 After National Material served its second supplemental answers to interrogatories and untimely disclosed additional documents on November 2, 2017, GSI conducted a Rule 201(k) conference and attempted to pin down National Material on whether it was planning on amending its expert's report and testimony relating to damages. GSI was

59

evasive in its answer, waiting another week to disclose Cobb's revised supplemental report. At this point, in mid-November 2017, the trial was set for February 26, 2018. While National Material has been opaque on revealing exactly when it realized that substantial revisions to Cobb's expert report were necessary, the timeline suggests that National Material was aware of this need before its November 2, 2017, production of documents, which included a newly created document allegedly supporting Cobb's revised damages calculations. National Material's decision to continue dropping new discovery on GSI with little or no explanation, some of it while knowing it was about to drop a bombshell of a disclosure via Cobb's supplemental report, does not suggest good faith. For these reasons, we find the sixth factor, the good faith of the party offering the evidence, to be neutral.

¶ 144 The trial court considered these factors in finding that National Material violated the rules of discovery, and that the appropriate sanction was to strike Cobb's supplemental report and to bar introduction of the evidence related to the report at trial. In rendering its decision, however, the court was predominately concerned that allowing Cobb's supplemental report would open the floodgates to expansive, never-ending discovery. With due regard for the trial court's valid concern, we find that the trial court abused its discretion in ordering the evidence and testimony barred as a sanction. The slope was only as slippery as the trial court would allow, meaning the trial court could have limited the additional discovery to revisions of the experts' reports and to the depositions of the experts and Fergus.

¶ 145 At the time of the trial court's order in January 2018, the trial had been continued from February 26, 2018, until September 4, 2018. While National Material's untimely

supplement caused surprise and prejudice to GSI, the continuance of the trial date meant there was ample time for the curative measures suggested by National Material to have been taken. Furthermore, the trial court could have ordered National Material to have borne the expense incurred by GSI in conducting additional discovery, to mitigate any prejudice suffered by GSI as a result of National Material's actions. Such an order allowing additional discovery and revisions of the experts' reports, at National Material's expense, would have cured any surprise and prejudice to GSI from National Material's discovery violations and ensured a trial on the merits. Based on the foregoing, we find the trial court abused its discretion in barring Cobb's supplemental report and his related testimony as a sanction for National Material's discovery violations.

¶ 146            3. Was National Material Prejudiced by the Barring of
                         Cobb's Supplemental Report?

¶ 147 While this court finds the trial court abused its discretion in barring Cobb's supplemental report on damages and Cobb's testimony on his revised opinions, we conclude that reversal is not required because National Material has failed to demonstrate that is was prejudiced by the trial court's exclusion of the evidence. On appeal, National Material contends the trial court's ruling prejudiced it in two ways, (1) by preventing National Material from presenting testimony supporting an additional one million dollars in lost profit damages and (2) by preventing Cobb from responding to Spry's criticisms of Cobb's calculations of damages.

¶ 148  As already noted, the jury entered a general verdict on National Material's contract claim and awarded National Material $1,731,886.50 in damages. National Material did not

request a verdict form requiring the jury to itemize its award for lost profits and resale damages. Without an itemization, it is impossible to discern from the verdict how the jury allotted damages in this case and, therefore, impossible to determine whether Cobb's supplement report reflecting changes to his lost profit analysis would have had any effect on the jury's damages award.

¶ 149   Also, National Material's assertion that it was prejudiced because Cobb was not able to respond to Spry's criticisms of his report is unpersuasive. Although National Material was prevented from eliciting direct evidence from Cobb regarding Spry's criticisms of his report, the record demonstrates that National Material did elicit evidence as to some of Cobb's criticisms of Spry's report at trial. National Material achieved this via a thorough and effective cross-examination of Spry. This encompassed critiques of Spry's sales prices in computing lost profits, including the use of a weighted average sales price, and her alleged failure to appropriately consider GSI's purchases of pipeline inventory from other suppliers. Moreover, the trial court's order barring Cobb's testimony on his supplemental report specifically permitted Cobb to testify on rebuttal to respond to any criticisms made by Spry during her testimony. It cannot be said that the trial court committed reversible error because National Material failed to take advantage of this opportunity. Based on the foregoing, we find that reversal is not required because National Material has failed to demonstrate that it was prejudiced by the trial court's error in striking Cobb's supplemental report and barring Cobb's testimony at trial as to the conclusions, opinions, and information contained therein.

¶ 150                        B. Fergus's Testimony as to Damages

¶ 151  Next, National Material maintains it is entitled to a new trial on damages because the trial court erroneously limited Fergus's testimony as to damages as undisclosed expert testimony. National Material argues Fergus should have been permitted to offer his opinion as a lay witness of National Material's losses from GSI's breach because he had personal knowledge of National Material's profits and the methods used to calculate its lost profits. National Material contends the exclusion of this testimony was highly prejudicial because GSI attacked Cobb's use of $53 per hundredweight as material costs and $66.49 per hundredweight for the sales price to calculate lost profits. National Material asserts that Fergus's testimony "would have filled the gaps in Cobb's opinions" including showing that "the average selling price using Excel formulas [was] derived from the business record of National Material." We disagree.

¶ 152  The trial court's evidentiary rulings are reviewed for an abuse of discretion. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The court's determination will not be reversed unless no reasonable person would take the view adopted by the court. *In re Leona W.*, 228 Ill. 2d at 460. Even if the court's ruling was in error, this court will not reverse the judgment unless the error was substantially prejudicial and affected the outcome of the trial. *In re Leona W.*, 228 Ill. 2d at 460.

¶ 153 Even assuming that the trial court did err in excluding Fergus's testimony on damages, National Material has failed to demonstrate that the alleged error was prejudicial. At trial, Cobb testified that the material costs and sales prices he utilized to calculate lost profits were based upon discussions he had with Fergus and underlying documents, such

63

as inventory reports and the January 2009 letter agreement. As already noted, the experts' damages testimony encompassed almost two full days of trial. Each party was provided ample opportunity to allow their expert to sufficiently explain the bases of their opinions and their methodology. Cobb testified that his figures were based not only on his discussions with Fergus but also on National Material's business records. In light of the extensive testimony presented by the parties as to damages, it cannot be said that Fergus's additional testimony that he created the documents relied upon by Cobb or that the figures within those documents were prepared using "Excel formulas" would have affected the jury's determination as to damages. We find that the trial court did not commit reversible error in denying National Material's posttrial motion seeking a new trial on damages based on the court's evidentiary rulings.

¶ 154                              IV. Prejudgment Interest

¶ 155  In its final point on appeal, National Material argues the trial court erred in denying its posttrial motion requesting the court to award prejudgment interest. Section 2 of the Interest Act provides that a creditor shall receive 5% interest "for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing ***." 815 ILCS 205/2 (West 2008). National Material asserts it is entitled to prejudgment interest because the jury "necessarily found that the 2008-2009 Supply Agreement was an enforceable written contract for the sale of goods under the UCC." We disagree.

¶ 156  The jury was instructed that, in order to find in favor of National Material on its breach of contract claim, the jury must find (1) the existence of a contract between National Material and GSI, (2) satisfaction of the statute of frauds, (3) GSI's failure to perform or

64

repudiation of the contract, and (4) damages to National Material. The court instructed the jury as to several alternative ways that National Material could meet its burden. The jury was instructed that it could find that there was a signed, written contract between the parties; or that National Material had sent GSI a writing confirming the contract to which GSI failed to object; or the parties' contract fell within an exception to the statute of frauds. Based on the instructions, it was not necessary for the jury to find that the parties entered into a written contract in order for it to find in favor of National Material on its breach of contract claim.

¶ 157  National Material did not request that any special interrogatories be submitted to the jury, and the jury returned a general verdict in favor of National Material on its claim for breach of contract. Because the jury returned a general verdict and no special interrogatories, it is impossible to discern under which contract theory the jury found in favor of National Material. See *Movitz v. First National Bank of Chicago*, 982 F. Supp. 566, 570 (N.D. Ill. 1997) (plaintiff failed to demonstrate a right to prejudgment interest when it was available under only one of the three alternative theories of liability presented to the jury and the jury returned a general verdict). Thus, National Material has failed to demonstrate that there was a "written instrument" between the parties which would entitle it to receive prejudgment interest under the Interest Act. The trial court did not err in denying National Material's posttrial motion requesting prejudgment interest.

¶ 158                                   V. GSI's Cross-Appeal

¶ 159  On cross-appeal, GSI argues that the trial court erred in denying its posttrial motion requesting a judgment notwithstanding the verdict on all of three of National Material's

claims. The trial court should enter a judgment notwithstanding the verdict only when the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favored the movant that no contrary verdict could stand. *Turner v. Firstar Bank, N.A.*, 363 Ill. App. 3d 1150, 1159 (2006).

¶ 160                           A. National Material's First Claim

¶ 161  First, GSI contends the trial court should have entered a judgment notwithstanding the verdict on National Material's first claim, for breach of contract, because (1) National Material waived any breach of the 2008-2009 supply agreement by entering into the January 2009 letter agreement and (2) the claim was barred by the statute of frauds (740 ILCS 80/1 (West 2008)). "Waiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right." *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 326 (2004). GSI argues that the purpose of the January 2009 letter agreement was to mutually resolve the parties' disputes as to (1) existence of the 2008-2009 supply contract, (2) the release of the pipeline inventory, and (3) the pricing of the pipeline inventory and on future sales.

¶ 162  The jury was instructed that it could only find in favor of National Material on its first claim if it found that GSI had failed to prove the affirmative defense of waiver. The jury was instructed that GSI alleged, and had the burden of proving, that by entering into the January 2009 letter agreement, National Material waived all of its rights with respect to the two-year oral agreement, or at least such rights under the agreement as existed with respect to the pipeline inventory. Contrary to GSI's assertions, however, it cannot necessarily be said that the terms of the January 2009 letter agreement resolved *all* of the

66

parties' disputes, including the existence of the supply agreement or the pricing of future, non-pipeline inventory. Based on the evidence presented at trial, the jury could have interpreted the January 2009 letter agreement as a waiver of some of National Material's rights under the 2008-2009 supply agreement. The jury, however, could have also inferred that National Material negotiated the January 2009 letter agreement to mitigate its damages resulting from GSI's breach of the 2008-2009 supply agreement. Such an inference would have been reasonable in light of the evidence that the pipeline inventory had limited application to those other than GSI, which hindered National Material's ability to sell the products for anything other than scrap.

¶ 163  GSI also argues that National Material's breach of contract claim for the 2008-2009 supply agreement was barred by the Frauds Act (740 ILCS 80/1 (West 2008)). This court already addressed this issue in the prior appeal, and we decline GSI's invitation to reconsider the issue. Based on the foregoing, we find the trial court did not err in denying GSI's posttrial motion requesting the court enter a judgment notwithstanding the verdict on National Material's first claim.

¶ 164                    B. National Material's Second and Third Claims

¶ 165 Next, GSI contends that the trial court should have entered a judgment notwithstanding the verdict on National Material's second and third claims, for unjust enrichment and breach of the January 2009 letter agreement. A motion for judgment notwithstanding the verdict is a request for the circuit court "to set aside the jury's verdict and enter judgment in favor of the movant." *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 59. Here, the jury returned a verdict on National Material's first claim and did not reach

a verdict on National Material's second and third claim because they were brought in the alternative. As there was neither a verdict nor a judgment entered against GSI on National Material's second and third claims, the trial court did not err in refusing to grant GSI a judgment notwithstanding the verdict on those two claims.

¶ 166                    C. GSI's Conditional Points on Cross-Appeal

¶ 167 GSI's remaining claims on cross-appeal, requesting a new trial based on seven evidentiary rulings and instructional errors, are conditioned upon this court's denial of GSI's requests for judgment notwithstanding the verdict and this court's grant of National Material's request for an *additur* or a new trial on damages. Because this court has not granted National Material's request for an *additur* or a new trial on damages, we need not address GSI's remaining claims on appeal.

¶ 168                              CONCLUSION

¶ 169 Accordingly, the trial court's order denying the posttrial motions of National Material and GSI is affirmed.

¶ 170  Affirmed.